IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAVID A. BLAKE,
                Plaintiff,

v.                                                                      Civil Action No. 3:06CV112
                                                                              (Judge Bailey)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
                Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

David A. Blake ("Plaintiff") filed applications for DIB and SSI on December 22, 2003,

alleging disability beginning September 27, 1999, due to degenerative arthritis and bulging discs at

L4-5 and 5-1 levels with radiculopathy in both legs (R. 221, 242, 453).[2] The applications were

denied at the initial and reconsideration levels (R. 207, 213, 459, 465). Plaintiff requested a hearing,

which Administrative Law Judge ("ALJ") Donald T. McDougall held on October 3, 2005 (R. 43).

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart as the defendant in this suit.

[2] Plaintiff filed a prior application, in 1999, which will be discussed below.

Plaintiff, represented by counsel, testified on his own behalf. Larry Bell, a Vocational Expert ("VE"), also testified. On October 31, 2005, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time since March 29, 2001 (R. 31). The Appeals Council denied Plaintiff's request for review (R. 8), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

David A. Blake ("Plaintiff") was born on February 2, 1957, and was 48 years old on the date of the ALJ's Decision (R. 33, 47). He finished high school and has past relevant work as a grounds maintenance worker, herbicide sprayer/power line clearer, and concrete finisher (R. 67). He stopped working in September 1999.

On November 2, 1999, Plaintiff presented to Dr. Katiny "[s]till complaining from low back pain on the left side and numbness in his left leg from a previous injury." (R. 152). Examination showed mild to moderate tenderness on the left sacroiliac ("SI") joint. Straight leg raising was positive at 30 degrees on the left. The diagnosis was left sacroiliitis/numbness in the left leg. The doctor injected Plaintiff's left SI joint and gave him a prescription for Lorcet Plus. Dr. Katiny referred Plaintiff to neurologist Shiv Navada, M.D.

On November 16, 1999, Plaintiff presented to Dr. Navada for neurological consultation (R. 159). His chief complaint was left leg numbness. He could not recall any specific trauma to his back or leg. He complained of tingling and numbness in the left leg without weakness. He had difficulty walking more than half a mile, after which he developed severe pain in the left leg all the way up to the hip. The pain was quite sharp at times. Plaintiff had no muscle atrophy. Dr. Navada related that Plaintiff told him he had had a back injury in 1988, after which he was told by Dr.

2

Weinstein that he had "some slipped discs."

Upon examination, Plaintiff's height was 6'2" and he weighed 234 pounds (R. 159). Straight leg raising was mildly positive both sitting and supine. Strength was normal and sensory exam was normal. Ankle reflexes were decreased bilaterally with the left more hypoactive than the right. Plantar responses were flexor. Plaintiff had a slightly antalgic gait. He could walk on his toes and heels and could tandem walk and perform a deep knee bend. Dr. Navada diagnosed probable L5-S1 radiculopathy and prescribed Lodine and Neurontin.

A motor nerve study was conducted on November 19, 1999 (R. 158). The study was "abnormal and [] supportive of left L5 radiculopathy."

A December 3, 1999, MRI showed a small focal herniated nucleus pulposus, paracentrally toward the left, likely impinging the left L5 nerve root (R. 155).

On December 8, 1999, Dr. Navada wrote to Dr. Katiny stating that Plaintiff continued to have some pain in his lower back along with paresthesia of his left leg (R. 154). Plaintiff, however, felt he had improved since his last visit. He was taking Lodine and Neurontin. His electromyography was supportive of left L5-S1 radiculopathy while the lumbar MRI showed a small disc herniation at the L5 level. Upon examination Plaintiff's strength was normal. He had some patchy hypalgias involving his left foot. Left ankle reflex was decreased. Plantar responses were flexor and sitting straight leg raising was mildly positive. Dr. Navada's diagnosis was left L5 radiculopathy, herniated nucleus pulposes, and low back syndrome/degenerative disc disease. He continued Plaintiff on conservative therapy.

On January 4, 2000, Dr. Katiny wrote to Dr. Navada, stating that Plaintiff continued to have pain in the left hip area at times radiating down his left leg (R. 153). He also reported some

numbness of the left foot. He had been prescribed Neurontin and Lodine, and was unable to tolerate Lortab. Upon examination, Plaintiff was alert and oriented, but seemed a little frustrated. Strength was essentially normal. There was some fasciculation involving the left extensor digitorum brevis muscle and some patchy hypoalgesia involving the toes. Reflexes were hypoactive. There was no left ankle reflex elicited. Plantar responses were flexor and straight leg raising was mildly positive sitting. Dr. Katiny informed Dr. Navada that his diagnosis was left L5-S1 radiculopathy secondary to herniated nucleus pulposes. He stated that he was disappointed that Plaintiff had not improved substantially, and opined that "Considering that he has denervation changes on electromyography and considering that his symptoms have not improved substantially in spite of conservative therapy of several months, he may very well require surgical intervention."

On January 24, 2000, Plaintiff saw neurologist James Weinstein, M.D. on referral from Dr. Navada (R. 161). Plaintiff was complaining of severe back pain radiating into the left leg and foot. Upon examination, Dr. Weinstein found Plaintiff had positive straight leg raising bilaterally with pain referred to the back. There was no weakness in the extensor function of the foot or great toes, but Plaintiff had decreased ankle jerks bilaterally. Dr. Weinstein opined that the MRI showed Plaintiff "ha[d] degenerative pathology at 4-5 and 5-1, but the major pathology [was] a small disc herniation at 4-5 on the left." Dr. Weinstein opined that the herniation likely impinged on the left L-5 nerve root. There was also a midline pathology at 5-1 with osteophytes, but he did not believe there was "any obvious nerve compression at that level." Dr. Weinstein opined that Plaintiff's major symptoms were due to the L4-5 pathology "and although the pathology is not physically very great in size I think it is enough to indicate surgery as the patient is not getting better and presuming that he does not get better in the immediate future." Plaintiff said he would consider surgery.

4

Plaintiff filed his first application for DIB on February 16, 2000 (R. 191).

On March 10, 2000, State agency reviewing physician Thomas Lauderman, D.O. completed a Physical Residual Functional Capacity Assessment ("RFC"), opining that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday (R. 163). He could occasionally perform all posturals. He should avoid even moderate exposure to hazards. Dr. Lauderman noted:

> Clmt has herniated disc at L4-5 with osteophytes at L5-S1, +SLR, needs surgery, and is taking Lorcet Plus and neurontin for pain. RFC is [reduced] for pain and fatigue.

(R. 167).

On August 7, 2000, State agency reviewing physician Hugh M. Brown completed an RFC opining that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, could stand/walk "at least 2 hours in an 8-hour workday" and could sit about 6 hours in an 8-hour workday (R. 171). He could perform all posturals occasionally. He should avoid concentrated exposure to vibration. Dr. Brown opined that Plaintiff's symptoms were attributable to a medically determinable impairment and reduced his RFC to light due to pain, clinical findings, and MRI.

On September 19, 2000, Plaintiff underwent an Independent Medical Examination ("IME") by Dr. Joseph Grady, M.D., upon referral from the Workers' Compensation division (R. 180). Plaintiff was 5'11', and weighed 230 pounds. He was able to ambulate around the room and get up on the examining table without difficulty. He had no noticeable limp or instability.

Upon examination of the lumbar spine, Plaintiff had no increased warmth, redness or swelling. He had some mild bilateral lumbar paraspinal muscle tenderness to palpation but no definite spasm on examination. There was no SI joint tenderness to palpation. Spinal curvature

appeared normal. He had decreased pinprick sensation, particularly of the left leg and foot, which the doctor found corresponded to an L5 dermatomal distribution, which corresponded to the lesion noted on the MRI. Straight leg raising was negative on the right and positive on the left at 45 degrees sitting, and positive on the right at 60 degrees and positive at 45 degrees on the left supine, without radiation. Plaintiff could stand on his heels, toes, and do tandem gait, with a little difficulty. He could squat only about half-way due to complaints of back pain.

Dr. Grady opined that Plaintiff had not yet reached maximum medical improvement (R. 185). He noted that Plaintiff had evidence of L5 radiculopathy which would make him a candidate for surgery, and that surgery was to be performed in the future by Dr. Weinstein. He did not give him an impairment rating due to the probability of surgery "in the very near future."

On September 28, 2000, Dr. Weinstein wrote to Dr. Katiny, stating that Plaintiff had just returned to see him after last seeing him in January (R. 179). Dr. Weinstein stated that Plaintiff had a modest herniated disc at L4-5 on the left, and that he was willing to do surgery. He then said that Plaintiff "put it off for various reasons, including the fact that his father got sick, but he is back now with the same symptoms only worse." On examination, the major findings were positive straight leg raising "at just a few degrees bilaterally." Dr. Weinstein reviewed the MRI and opined there was "a definite disc herniation at 4-5," but said he was not eager to perform surgery based on a year-old MRI. He requested a new MRI be ordered.

Dr. Weinstein also wrote to Plaintiff's attorney on October 23, 2000, opining that Plaintiff had been temporarily totally disabled since he stopped working September 27, 1999 (R. 178). He was waiting for authorization for a new MRI, and opined that Plaintiff remained temporarily totally disabled until the test an/or surgery was authorized.

On March 28, 2001, Administrative Law Judge ("ALJ") Randall W. Moon entered a Decision

6

regarding Plaintiff's February 16, 2000, application for DIB (R. 191). Plaintiff chose to proceed with this claim without representation. ALJ Moon found Plaintiff had a severe impairment of herniated vertebra at L4-5, with L5 radiculopathy (R. 193). ALJ Moon compared Plaintiff's symptoms to Listing 1.05(C), but found that while Plaintiff did have pain, muscle spasm, and significant limitation of motion of the spine, he did not have appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss, as required by the Listing. ALJ Moon then found Plaintiff not fully credible with regard to his limitations and disability (R. 194).

ALJ Moon found Plaintiff had the RFC to perform the exertional demands of sedentary work, or work which is generally performed while sitting and never requires lifting in excess of ten pounds. He also found Plaintiff could not perform any job requiring him to sit more than six hours or walk/stand more than two hours; must be able to change position at will; and could not do any more than minimal stooping or bending. (R. 196).

The Appeals Council denied Plaintiff's Request for Review of the ALJ's decision and Plaintiff did not file a Complaint with the District Court regarding that claim.

The following three references are from medical records not directly included in the Administrative Transcript, for unknown reasons. They were quoted by orthopedic surgeon Joseph Snead, M.D., in his report of an October 22, 2003, evaluation of Plaintiff (R. 436). The undersigned finds no reason Dr. Snead would misrepresent any of the records, and therefore finds his report of the records reliable evidence that was before the ALJ.

Dr. Judith Brown evaluated Plaintiff on July 11, 2001, for Workers' Compensation. She felt he had not yet reach maximum medical benefit, but recommended a 22% whole man impairment.

Dr. Weinstein noted on July 26, 2001, that Plaintiff's straight leg raising was positive when the legs were barely elevated off the table.

Dr. Weinstein found on October 22, 2001, that Plaintiff had compression of the right S1 nerve root and the S2 nerve root, as well as an L4-5 bulging disk. He found that Plaintiff's anatomical abnormalities were too diffuse and not specific enough when compared to his symptoms to be able to say that surgery would be curative. Dr. Weinstein planned to operate on the L5-S1 disc on the right side but noted that that would not do anything for Plaintiff's left leg pain, which was equal to the right leg pain.

On January 17, 2002, Dr. Weinstein wrote to Dr. Katiny, stating:

> At this time the patient has not been able to make up his mind as to whether or not he wants to have back surgery. He was to have had a second opinion and I had recommended Dr. Navada. Perhaps, arrangements can be made for this consultation.

(R. 294).

On March 25, 2002, Plaintiff presented to Dr. Edita Milan, M.D. for the first time (R. 348).[3] Dr. Katiny would not accept Workers' Compensation, so Plaintiff needed to find another physician who would. Dr. Milan noted that Plaintiff told her that Dr. Weinstein had "at one point" recommended back surgery "but he did not reassure the patient that it will relieve all of his symptoms and therefore the patient has not decided to go through an operation. He fears that he may not have a good response from the operation." Dr. Milan opined that the MRI indicated a

---

[3] The undersigned notes that part of the reason the ALJ gave Dr. Milan reduced weight was because he determined her specialty was in Pediatrics. Plaintiff argues Dr. Milan is in family practice. The transcript includes a "search"- type document stating that Dr. Milan's primary specialty is in pediatrics (R. 359). Plaintiff, on the other hand, attached Dr. Milan's CV, which indicates she is a pediatrics specialist, but is also a General Practitioner and Family Practitioner.

compression of the right S1 nerve root, with possible impingement of the S2 nerve root as well; a moderate herniation at L4-5; and chronic lumbar strain and sprain and nerve root irritation. She also opined that Plaintiff's myelogram suggested a moderate sized herniated disc at L4-5 on the right.

Plaintiff told Dr. Milan he was taking Talacen for pain, but that it made him nauseous all the time and upset his stomach, so he wanted to go back to Darvocet and Percocet. He "feels that he had relief of pain with this medication and he doesn't have any gastric irritation."

Upon physical examination, Plaintiff was 6'11, and weighed 260 pounds (R. 349). He appeared to be in pain and had difficulty sitting for a long time and difficulty getting on and off the examining table due to pain. He ambulated with an antalgic gait. He had tenderness of the lumbosacral spine with radiation to the left gluteal area. He was unable to bend from the hips due to back pain. He had numbness of the left leg, with decreased pinprick and light touch sensation over the left leg at the L5 distribution. Achilles deep tendon reflexes were absent bilaterally.

Dr. Milan diagnosed chronic low back pain, traumatic in nature, secondary to herniated disc at L5 to the left, with evidence of radiculopathy and bulging L4-5 disc; hypertension; and obesity (R. 349).

On April 26, 2002, Plaintiff presented to Dr. Milan for follow up (R. 346). He continued to have constant, throbbing, and sharp and stabbing low back pain.

Upon examination, Plaintiff was in severe pain, could not sit still, had to stand up, had difficulty getting on and off the examining table, and ambulated with an antalgic and unsteady gait (R. 346). He was tender in the lumbosacral area with radiation to the left gluteal area with pain extending down the left leg. He had numbness of the left leg, with decreased pinprick and light touch sensation.

9

Dr. Milan again diagnosed chronic low back pain with herniated disc at L5 and bulging discs at L4-5, hypertension, and obesity.

On June 25, 2002, Plaintiff presented to Dr. Milan for follow up, refill of medications, and authorization for medications from Workers' Compensation (R. 345). His complaints were the same with the addition of stiffness in the left leg for the past 4-5 days and sharp pain on the left foot whenever he walked.

Upon physical examination, Plaintiff walked with a slight limp. He had tenderness of the lumbosacral spine with radiation to the left gluteal area and left leg. Straight leg raising in the sitting position elicited severe pain at 0 degrees. He had numbness of the left leg, with decreased pin prick and light touch sensitivity. There was tenderness of the plantar surface of the left foot.

Dr. Milan diagnosed chronic low back pain, possible heel spurs, hypertension, and obesity.

On August 24, 2002, Plaintiff presented to Dr. Milan for a follow up (R. 344). Upon physical examination, Plaintiff was constantly shifting standing and sitting positions. He had moderate tenderness of the lumbosacral spine with radiation to the left paraspinal muscles and gluteal area and down the left leg. Straight leg raising in the sitting position elicited severe pain at 0 degrees. He had numbness with decreased pinprick and light touch sensation of the left leg.

Dr. Milan again diagnosed chronic low back pain, hypertension, and obesity.

On September 24, 2002, Plaintiff saw Dr. Milan for follow up (R. 343). He had a letter from Workers' Compensation stating that he was recommended for Physical Therapy. He had also received a TENS unit. Symptoms, examination, and diagnoses were generally the same.

On October 24, 2002, Plaintiff followed up with Dr. Milan (R. 342). Symptoms, examination, and diagnoses remained generally the same. He was wearing his TENS unit.

Dr. Grady performed a second IME of Plaintiff for the Workers' Compensation employer on November 14, 2002, finding Plaintiff had 40 degrees of lumbar flexion with the ability to bend over 70 degrees at T12, 15 degrees of extension, and 25 degrees of tilting each way. Dr. Grady gave Plaintiff a 15% whole man impairment. (Again, this report is not directly contained in the record, but was summarized by Dr. Snead in his October 2003, report).

On November 22, 2002, Plaintiff followed up with Dr. Milan (R. 341). His conditions remained generally the same. The doctor noted Plaintiff was not wearing his TENS unit, stating, however, that "[h]e is not allowed to use it when driving."

On February 21, 2003, Plaintiff presented to Dr. Milan with complaints of intense back pain (R. 338). There had been a power failure in his area, and he had had to carry buckets of water from the creek to his house for the past six days, and felt like he had "been hit on the back with a 2x4." Diagnoses remained generally the same.

Plaintiff underwent a Functional Capacity Evaluation ("FCE") on March 20, 2003 (R. 363). He was found to be able to work "above the sendentary/light to light" exertional level. The results were considered valid and reliable. Plaintiff had consistent heart rate elevations, which the examiner felt was due to significant de-conditioning.

On March 21, 2003, Plaintiff reported to Dr. Milan that he had gone for the FCE the day before (R. 337). He started to have severe back pain after the evaluation, which worsened the next day. The doctor noted Plaintiff was unable to lie flat on the examining table, and had to lie on his side to get up or be comfortable. Diagnoses remained the same.

Plaintiff began physical therapy on April 11, 2003 (R. 305). Ten days and five visits later, Plaintiff continued to rate his pain at 5/10 with radiation down the left leg. He reported minimal

change in symptoms. The therapist was to attempt one to two weeks more of therapy, but if no progress was noted, would discharge him to a home exercise program.

Two days later, Plaintiff reported to his physical therapist that he had back discomfort due to mowing the grass on a riding mower (R. 304). Three days after that, he continued to ambulate with an antalgic gait, and reported pain of 6/10.

On April 22, 2003, Plaintiff told Dr. Milan he had begun physical therapy (R. 336). Symptoms, examination and diagnosis remained generally the same. Plaintiff was still unable to lie flat.

On May 7, 2003, Plaintiff reported increased lower back pain after sitting an increased amount of time the day before, with excessive driving (R. 303).

On May 8th, Plaintiff's physical therapist wrote to Dr. Milan, stating that Plaintiff's pain was still at 5/10 (R. 302). His straight leg raising was unchanged at 60 degrees on the left. His lumbar extension had improved slightly, from zero degrees initially to 10-15 degrees. He still had moderate to major restrictions with lateral flexion to both right and left with pain at the end range on the left. Hie also had moderate restrictions with lumbar flexion with pain at the end range in the LS region, but denied radicular symptoms. His progress was very slow, and Plaintiff was very guarded with all movements, despite the therapist's encouragement to progress with a conditioning program. She believed Plaintiff was trying, but was unable to progress due to pain.

On May 13, 2003, Plaintiff reported his back was "not feeling too bad" that day, with pain at 4/10 (R. 303).

The next day Dr. Milan told the therapist that if Plaintiff was noting improvement, to continue with therapy (R. 303). Plaintiff stated he felt temporary improvement with therapy, but

overall saw slow improvement.

Plaintiff's therapist then spoke with Plaintiff's workers' compensation case manager, who wanted him to continue physical therapy (R. 301). She noted that Plaintiff had had no physical therapy or rehabilitation for over three years after his injury, and that she had therefore been aware that his progress might be slow.

On May 29, 2003, Plaintiff reported being very sore after having to replace his water heater (R. 299). The next day Plaintiff stated his symptoms continued. He was to begin a job search as a requirement for his benefits (R. 299).

On June 17, 2003, Plaintiff reported job hunting, walking into several offices in town to find a job, as a requirement of his Workers' Compensation (R. 334). After several days of walking and driving, his legs, back and feet began to hurt more and he developed spasms of the hands and legs at night for the past three weeks. He was doing his home exercise program. He still needed to do three contacts for jobs that week.

On July 16, 2003, plaintiff reported to Dr. Milan with no new complaints (R. 333). He reported that Workers' Compensation had stopped paying for his medications about six months earlier.

On August 14, 2003, Plaintiff reported new pain in his left leg (R. 332).

On August 27, 2003, Plaintiff requested he be changed to a lower dose of his blood pressure medication because he was waking up to go to the bathroom four times a night (R. 331). Otherwise the medication appeared to be working well. Dr. Milan told Plaintiff there was no lower dose of the medication, and advised he should remain on it as it otherwise appeared to be working well.

On September 15, 2003, Plaintiff complained of more severe back pain (R. 330).

13

On October 14, 2003, Plaintiff presented to Dr. Milan for follow up. His condition remained generally unchanged.

On October 22, 2003, Plaintiff presented to orthopedic surgeon Joseph Snead, M.D., for purposes of an "impairment evaluation" requested by Plaintiff's counsel (R. 436). Dr. Snead found Plaintiff had much less range of motion than had Dr. Grady in 2002, and questioned Plaintiff about this. He showed Plaintiff how far 70 degrees was (the amount Dr. Grady had stated that Plaintiff had bent). Plaintiff insisted he had never been able to bend over that far (R. 437).

Upon physical examination, Dr. Snead found Plaintiff appeared to be in quite a bit of pain (R. 438). When the doctor came into the room Plaintiff was lying in the fetal position on the examining table and had a great deal of difficulty getting back up into a sitting position. He had considerable tenderness around the L3-L5 area. He had no limp but could not squat down. He walked leaned forward and held onto the examining table to walk around the room. He demonstrated subjective sensory deficits in the legs "in the region of the S1 nerve routes [sic]". There were no ankle or knee reflexes elicited on either side.

Straight leg raising was positive at nearly zero degrees both sitting and supine. Plaintiff had no calf muscle atrophy. Lumbar spine motion was measured with an inclinometer Plaintiff could bend over 10 degrees. The movements were very difficult and painful. He had no lumbar extension at either T12 or at the sacral level. Both right and left lateral flexion were 10 degrees.

Dr. Snead concluded: "This man has degenerative arthritis and bulging discs at the 4-5 and 5-1 level with radiculopathy in both legs. He is a borderline candidate for surgery but has elected not to have an operation. He has reached maximum medical benefit and he can never return to work as a Concrete Finisher." Dr. Snead calculated Plaintiff to have a 27% whole person impairment.

He noted that his exam and Dr. Grady's 2002 exam differed significantly. Dr. Snead signed the "Range of Motion Certification" finding Plaintiff met all four validity tests (R. 442). He concluded: "The patient does, incidentally, meet validity criteria" (R. 439).

On November 13, 2003, Plaintiff came into Dr. Milan's office using a cane. He was comfortable lying on his side. He reported he had been started on "the Spine Med back treatment" with fair to good response (R. 328). Dr. Milan then stated: "However, when he came for his back treatment on 11/06/03 the belt that was part of the chest harness was jerked 3 to 4 times and because of this I think that he developed severe pain on the tailbone, left ankle and the left groin. He felt like the pain was 'like fire.' The symptoms were relieved when he assumed lateral recumbent positions. He stopped taking his treatments on 11/06/03 so he missed one whole week of sessions." The examination and diagnosis remained generally the same. He was encouraged to return for his back treatments the next week.

On March 3, 2004, Dr. Milan wrote a letter to Workers' Compensation to authorize Plaintiff's prescriptions for Percocet and Darvocet (R. 407). In the letter Dr. Milan stated:

> The patient will always have severe back pain because of the nature of his compensable back problems. It is medically necessary for him to take these medications so he can at least perform minimal to optimum physical activities of daily living. He showed me a letter (a copy of which was never sent to me), that you have denied him reimbursement for his medications since April 2003. This patient is financially crippled, unable to work at all and has no substantial source of income. It has [sic] becoming increasingly difficult for him to pay cash for his medications.

On April 28, 2004, Plaintiff underwent a physical examination, performed by Arturio Sabio, M.D., at the request of the State Disability Determination Service (R. 307). Upon examination Plaintiff was 5'10 and weighed 263 pounds (R. 309). He was moderately obese. He walked with

an antalgic gait and stood bent forward about 10 degrees due to pain. There was tenderness over the spinous processes of the lumbar spine, without kyphosis or scoliosis. Straight leg raising was positive at 45 degrees on the right and 30 degrees on the left, restricted by pain. Flexion of the knees was "mainly restricted by obesity." He was unable to walk on his heels or toes or squat due to low back pain. He could walk heel-to-toe in tandem and could stand on either leg separately. Patellar reflexes could not be elicited on either side. Dr. Sabio diagnosed Plaintiff with degenerative disc disease, herniated lumbar disc by history, and degenerative arthritis of the lumbar spine (R. 310).

On May 26, 2004, State agency reviewing physician Fulvio Franyutti, M.D. completed an RFC, based on a primary diagnosis of Low Back Pain Syndrome, with Degenerative Disc Disease and Herniated Nucleus Pulposes with radiculopathy, and a secondary diagnosis of Obesity (R. 312). Dr. Franyutti found Plaintiff could lift 10 pounds occasionally and 10 pounds frequently, stand/walk two hours, and sit about 6 hours in an 8-hour workday. He could never kneel, crouch or crawl or climb ladders, ropes or scaffolds. He could occasionally perform all other posturals. He should avoid concentrated exposure to temperature extremes. Dr. Franyutti found Plaintiff's symptoms were attributable to a medically determinable impairment, and reduced his RFC to sedentary based on pain, fatigue, and "very limited" range of motion.

On June 21, 2004, Plaintiff presented to Dr. Milan for follow up and refills (R. 323). He had developed exacerbation of back pain after mowing the lawn on a riding mower for 45 minutes. He was unable to sleep due to pain. Examination, symptoms, and diagnosis were generally unchanged, with the addition of insomnia due to pain, for which Dr. Milan prescribed Ambien.

On July 6, 2004, Plaintiff followed up with Dr. Milan, with complaints of worsening pain with radiation to both legs, with tingling and numbness in the legs (R. 324). The examination and

diagnosis remained generally unchanged.

On July 15, 2004, Plaintiff was examined by orthopedic surgeon P. Kent Thrush, M.D., for the employer in Plaintiff's Workers' Compensation case (R. 448). Upon examination Plaintiff was 5'11 and weighed 268 pounds (R. 450). Plaintiff said he had gained 30 or 40 pounds since his injury. Plaintiff could stand unassisted but had a mild antalgic lean to the right. There was no paraspinal muscle spasm and he walked without a limp. Plaintiff could do a half squat and get up unassisted. On inclinometer testing, Plaintiff averaged forward flexion of 30 degrees; extension of 15 degrees; and left and right lateral bending of 25 and 20 degrees respectively. Reflexes were 1+ in the knees and trace in the ankles. There was normal sensation in both lower extremities. Straight leg raising was positive at 30 degrees on the right and left both sitting and supine. Dr. Thrush did not personally review the 1999 MRI, but only the report of the MRI. He noted the report showed a small disc herniation at L4-5 on the left and no abnormality at L5-S1 except for some small osteophytes (R. 451). He did personally review the myelogram and CT scan, finding: "At L4-L5 he has mild narrowing of the spinal canal but no evidence of disc herniation. At L5-S1, he has evidence of a small to medium disc herniation at L5-S1 on the right." Dr. Thrush diagnosed Disc Herniation L5-S1 on the right, and opined that Plaintiff had reached maximum medical improvement, with a whole man impairment of 15%. He found Plaintiff met all four validity tests.

On August 21, 2004, Plaintiff presented to Dr. Milan for followup and refills (R. 326). His weight was up to 273 pounds. The symptoms, diagnosis and examination were all essentially the same.

On August 22, 2004, an RFC was completed by a State agency reviewing Medical Consultant [name illegible], who found that Plaintiff could lift up to 10 pounds, stand/walk at least 2 hours in

17

an 8-hour workday, and sit about 6 hours in an 8-hour workday (R. 352). He could never climb ladders, ropes or scaffolds. His symptoms, including that pain medications caused upset stomach, were found to be credible (R. 356).

On September 16, 2004, Plaintiff presented to Dr. Milan for a followup (R. 402). He was using a cane and limped. Dr. Milan noted Plaintiff was "negative for Oxycodone in his urine drug screen and positive for Darvocet. He was informed about this and he was very surprised and upset and he insisted that he was taking his medications every day and his wife is a witness to this." The doctor noted Plaintiff appeared to be in constant pain, and was "very upset about his negative urine screen." Straight leg raising was positive at 4 degrees sitting and 3 degrees supine on the right and 5 degrees sitting and 1 degree supine on the left. He had markedly diminished pain sensation and touch on the left leg along the distribution of L5.

Dr. Milan's diagnosis remained severe low back pain and insomnia secondary to pain.

Plaintiff's symptoms and diagnosis remained the same on October 15, 2004 (R. 397). An MRI on November 4, 2004, showed:

> 1. Disk dessication with narrowing of the intervertebral disc space at the level of L4-5 and L5-S1;
> 2. Concentric bulging of the annulus onto the thecal sac at the level of L4-5 without any evidence of spinal canal or neural foramina stenosis; and
> 3. Concentric bulging of the disk causing minimal bilateral neural foramina stenosis. The spinal canal is not narrowed.

(R. 409).

On November 18, 2004, Plaintiff followed up with Dr. Milan with "the same low back pain problems" (R. 395). X-rays of the lumbar spine on December 4, 2004, showed intervertebral disc space narrowing at L4-5 and L5-S1, with straightening of the lumbar spine possibly due to muscle

18

spasm (R. 408).

On January 13, 2005, Plaintiff complained to Dr. Milan of having a terrible back pain into his neck for two days (R. 391). Plaintiff's complaints, examination, and diagnoses remained generally the same through May 2005 (R. 386-389).

On June 7, 2005, Plaintiff complained his back pain was radiating into his knees and ankles, with numbness upon waking in the morning (R. 382).

On August 5, 2005, Dr. Milan wrote a latter to Plaintiff's counsel in response to a request for a medical report (R. 380). In the letter, Dr. Milan stated:

> As you know, Mr. Blake suffers from severe intractable lumbosacral pain resulting from a moderate sized herniated disc at L4-L5 on the right side with compression of the right S1 nerve root. A neurosurgical evaluation by Dr. Weinstein does not guarantee or reassure the patient's relief of his symptoms with surgical intervention. The patient is therefore maintained on pain medications, (Percocet for the actual pain and Darvocet for breakthrough pain or rescue pain.) This was started by Dr. Weinstein 3-4 years ago. The patient's ability to function is extremely compromised. He is unable to perform activities of daily living because every movement aggravates the back pain. He is unable to maintain a position of comfort and unable to sleep at night. The patient suffers from depression and anxiety because of the pain, which he describes as "crippling and intolerable." He needs these pain medications to allow him to perform minimal to optimum activities of daily living. Under the present circumstances, I believe, to a reasonable degree of medical certainty that these medications are reasonable and appropriate for the patient's current condition. He will always have severe, intolerable pain because of the nature of his compensable back problems.
>
> Surgical intervention at this time will not guarantee the patient's medical improvement. He needs to stay on his current medications.

(R. 380).

On August 8, 2005, and September 7, 2005, Plaintiff's symptoms, examination, and

19

diagnosis remained generally the same.

On September 21, 2005, Dr. Milan wrote a letter to Plaintiff's counsel in response to a request for a medical report (R. 374). She stated:

> In addition to my prior letter of August 5, 2005, I will attempt to address some of your particular questions. As you know, Mr. Blake has had objective evidence of a small herniated disc at L4-5 likely impinging the L5 nerve root and a moderate herniated disc affecting the S1 nerve root and possibly the S2. This is based on the MRI dated December 3, 1999 and the CT dated October 5, 2001. He had another MRI of the lumbar spine done on November 4, 2004 with similar findings.
>
> I have reviewed the criteria you provided numbered 1.04 Disorders of the Spine. Although Mr. Blake's condition is extremely close, it appears that a strict application would not allow me to say that he has all the criteria. Mr. Blake's numerous exams have confirmed all of these factors except muscle weakness. As noted above he does have a herniated disc with nerve root compression. My initial exam of Mr. Blake indicated that he had 2 to 3+ tenderness of lumbosacral midline and could not bend at the hips due to back pain. Although I did not specifically document decreased range of motion, I have observed him to have decreased range of motion of the lumbar spine on numerous occasions and such deficiencies were noted by Dr. Snead in his October 22, 2003 report. My initial exam showed numbness of the left leg, decreased deep tendon reflexes and decreased pinprick and light touch sensation in the L5 distribution. On June 23, 2002 Mr. Blake's SLR was positive at 0 degrees. Dr. Snead's 2003 exam found similar findings in both the sitting and supine positions. My subsequent exams have continued to show similar findings. He does not seem to exhibit muscle weakness so I cannot say that he meets the criteria of this rule 100%. However, I can say with a high degree of certainty that his back condition meets the vast majority of the criteria in 1.04 except one. I can further say that his condition is equivalent to the criteria set forth in the rule and just as severe and disabling.
>
> At this point, Mr. Blake has not chosen surgery, which I believe is a reasonable choice given the risks of surgery. He is maintained on strong pain medications. These medications have expected side effects of grogginess and sleepiness, which affect Mr. Blake's ability to focus on work tasks. From a physical standpoint, he is not able to walk, stand or sit for any significant amount of time. He cannot sit on

a riding lawn mower for more than an hour because it severely exacerbates his back pain. Lifting is, likewise, limited to minimal amounts, less than 10 lbs. He frequently changes positions for comfort. He needs to rest 2-3 times daily in bed for 1 hour at a time. This position does provide him some pain relief as it unloads weight and pressure off of his spinal column. Mr. Blake's lack of sleep also contributes to significant daytime drowsiness, which would in turn also cause him to lose focus on daily tasks.

Overall, it is my opinion that Mr. Blake is disabled from any type of work. I have found him to be very forthright with me, and I find his complaints consistent with his physical impairments. He has a severe back impairment that simply renders him unable to attend a full time or part time job. I feel that Mr. Blake's condition has been as described above since his date of injury on September 27, 1999. No further rehabilitation or work conditioning can improve his functional capacity at this time.

(R. 375).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits as set forth in section 216(i) of the Social Security Act and is insured for benefits only through December 31, 2004.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's vertebrogenic disorder; hypertension; and obesity are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c)).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Subpart P, Appendix 1, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. Since March 29, 2001, the claimant has had the following residual functional capacity: he is able to perform the demands of light, sit/stand work, sitting and standing at will, with no requirement to climb ladders, scaffolds, ropes,

21

stairs or ramps, and with the ability to miss up to two days of work each work month.

7.  The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

8.  The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9.  The claimant has a "high school" (or high school equivalent) education"(20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work at the light exertional level as: a ticket seller, 1,700 regionally and 190,000 nationally; a parking lot attendant, 1,300 regionally and 85,000 nationally. At the sedentary exertional level the claimant could perform work as: a machine tender, 1,400 regionally and 141,000 nationally; and an assembler, 1,400 regionally and 149,000 nationally. Furthermore, the vocational expert testified that the above-cited jobs are consistent with the Dictionary of Occupational titles expect [sic] for the reference to sit/stand option which is consistent with his experience (Social Security Ruling 00-4p).

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time since March 29, 2001 (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 31-32).

## IV. Contentions

A.  Plaintiff contends:

1.  The Commissioner erred by denying Mr. Blake the opportunity to fully and effectively appeal the ALJ's Decision to the Appeals Council, thereby denying Mr. Blake Due Process of Law;

a. The Appeals Council failed to provide Mr. Blake with a copy of the exhibit file and hearing transcript, as required by the Regulations;

b. The Appeals Council failed to review all of the evidence contained in the ALJ's hearing record;

2. The ALJ erred by failing to adequately consider whether Mr. Blake's conditions met or equaled the Listings;

3. The ALJ erred by utilizing an RFC finding that is inconsistent with both the Medical Opinions in the record and the prior ALJ's Decision;

4. The ALJ erred by failing to follow AR 00-1(4) when considering Mr. Blake's RFC;

5. The ALJ erred by improperly rejected [sic] the treating physician's opinion; and

6. The ALJ erred in concluding that Mr. Blake was not credible.

B. The Commissioner contends:

1. Substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled on March 29, 2001 through October 31, 2005, the date of the Commissioner's final decision;

a. Plaintiff's Due Process has not been violated;

2. Plaintiff does not meet or equal Listing §1.04;

3. Plaintiff's [sic] retains the residual functional capacity to work and is not disabled;

4. Although the ALJ did not fully comply with the provisions of social Security Acquiescence Ruling 00-1(4) by omitting the weight he gave to the prior ALJ's RFC finding that Plaintiff was limited to sedentary work, this error is harmless since the vocational expert identified sedentary jobs which allowed for a sit-stand option;

5. The ALJ properly evaluated the Medical Opinion of Dr. Milan; and

6. The ALJ properly concluded that Plaintiff was not fully credible.

### V. Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Due Process

Plaintiff first argues that the Commissioner erred by denying Mr. Blake the opportunity to fully and effectively appeal the ALJ's Decision to the Appeals Council, thereby denying Mr. Blake Due Process of Law. His grounds for this argument are: 1) The Appeals Council failed to provide Mr. Blake with a copy of the exhibit file and hearing transcript, as required by the Regulations; and 2) The Appeals Council failed to review all of the evidence contained in the ALJ's hearing record. Defendant contends that Plaintiff's Due Process rights were not violated. Because the undersigned finds the ALJ's decision in this matter should be reversed and remanded for other reasons, the merits

24

of this contention are not addressed.

## C. Listings

Plaintiff next argues that the ALJ erred by failing to adequately consider whether his conditions met or equaled the Listings. Defendant contends Plaintiff does not meet or equal Listing § 1.04. The Fourth Circuit addressed the issue in Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).

> First, the Secretary is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of her decision a statement of the reasons for that decision. The decision of the ALJ, which became the Secretary's decision as a result of the denial of review by the Appeals Council, fails to explain the reasons for the determination that Cook's arthritis did not meet or equal a listed impairment. The full explanation offered by the ALJ is as follows:

>> An examination and x-rays of the right hip and left shoulder in May 1983 established the existence of severe osteoarthritis with moderate to severe limitation of motion of the claimant's shoulders, elbows, wrists, knees, hips, neck, and back as well as markedly decreased grip. However, the claimant's arthritis impairment does not meet or equal in severity the requirements of Section 1.01 of Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or the other mandated criteria.

> This explanation is deficient for several reasons . . . . [The ALJ] also failed to compare Cook's symptoms to the requirements of any of the four listed impairments, except in a very summary way . . . .

> The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

Id. at 1172-1173. (Emphasis added). In the case at bar, the ALJ found:

> The claimant's medical treatment record does not establish the

25

functional limitations, clinical or laboratory findings demonstrated on physical examination, as required for his vertebrogenic disorder or hypertension, considered separately or in combination, and also considered separately and in combination with his obesity, to meet the severity of section 1.02, 1.03, 1.04, and 4.03 of the Listing of Impairments.

(R. 27). The ALJ then discussed "expired Listing 9.09A" regarding obesity, and why Plaintiff would not have met that Listing had it still been in effect.

The undersigned finds the ALJ's explanation regarding the Listings, in particular Listing 1.04, insufficient under <u>Cook</u>. In fact, the ALJ's analysis here contains less of an explanation than that in <u>Cook</u>. Plaintiff here demonstrated at least some of the requirements of Listing 1.04, which provides:

> *Disorders of the spine* (e.g., herniated nucleus pulposes, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord.
>
> With
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)
> . . . .

There is objective medical evidence in the record indicating Plaintiff did have at least one and possibly two herniated nucleus pulposes resulting in compromise of a nerve root. There is also evidence in the record of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, sensory or reflex loss, and positive straight leg raising tests. shows. Defendant argues that "the ALJ certainly considered whether Plaintiff met or equaled the listing, and cited to evidence in the record that discounted any such claim (Tr. 20-27)." Defendant

26

also argues: "A strict application of the listing, however, is required to meet or equal it . . . . The record certainly confirms that Plaintiff lacked the required atrophy, muscle weakness, and motor loss necessary to demonstrate a presumably disabling condition . . . . Without evidence of atrophy and motor loss, Plaintiff's claim that he meets Listing § 1.04 must fail." (Defendant's Brief at 10). Even if it is found that Defendant does not actually meet the Listing, Defendant's argument itself actually points out the insufficiency of the ALJ's analysis. Under Cook, it is the ALJ, not the Commissioner, who "should have identified the relevant listed impairments [and] should then have compared each of the listed criteria to the evidence of [Plaintiff's] symptoms." The ALJ did not compare Listing 1.04 to Plaintiff's symptoms. For that reason alone, this case should be remanded.

Additionally, however, the ALJ did not explain why he found Plaintiff did not equal the listing. § 404.1526 (2005) provides:[4]

> How medical equivalence is determined. We will decide that your impairment(s) is medically equivalent to a listed impairment in appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairment(s) as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment. If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal. If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

The undersigned has already found the ALJ did not compare Plaintiff's symptoms, signs, and

---

[4] The Regulation was revised effective March 2006, but the Court uses the Regulation as it was in effect at the time of the ALJ's decision. Further, a review of the Regulation both pre- and post-revision shows no change that would affect the undersigned's decision substantively. On remand, the Commissioner should analyze Plaintiff's impairments under the revised Regulations.

laboratory findings with the Listing 1.04. This is equally true for a finding of equivalency. Additionally, however, Plaintiff's long-time treating physician, Dr. Milan, opined that Plaintiff did equal the Listing, stating:

> He does not seem to exhibit muscle weakness so I cannot say that he meets the criteria of this rule 100%. However, I can say with a high degree of certainty that his back condition meets the vast majority of the criteria in 1.04 except one. I can further say that his condition is equivalent to the criteria set forth in the rule and just as severe and disabling.

Although the ALJ did not have to accept treating physician Milan's opinion regarding equivalency, he also cited no contrary opinion regarding equivalency.

For all the above reasons, the undersigned finds that substantial evidence does not support the ALJ's determination that none of Plaintiff's impairments, alone or in combination, met or equaled a listing.

## D. RFC

Plaintiff next argues the ALJ erred by utilizing an RFC finding that is inconsistent with both the Medical Opinions in the record and the prior ALJ's Decision. Defendant contends Plaintiff retains the residual capacity to work and is not disabled.

On March 28, 2001, ALJ Moon entered a decision finding Plaintiff had the RFC to perform sedentary work (R. 196). The Functional Capacity Evaluation of February 21, 2003, indicated Plaintiff could work at "above the sedentary/light to light" exertional level; however, it also stated he had only a "marginal" ability to sit 1/3 to 2/3 of an 8-hour workday, and could stand or walk only 0% to 33% of an 8-hour workday (R. 363). Dr. Milan, Plaintiff's treating physician, opined that Plaintiff could not work full time at any exertional level (R. 407). On May 26, 2004, State agency reviewing physician Franyutti opined that Plaintiff was limited to the sedentary exertional level (R.

312). On August 22, 2004, another State reviewer opined Plaintiff could work only at the sedentary level (R. 352).

The second ALJ determined Plaintiff could work at the "light" exertional level. In doing so, the ALJ rejected Dr. Milan's opinion as well as the two State agency physician opinions and the prior determination of ALJ Moon. The ALJ's treatment of Dr. Milan's opinion will be discussed later in this Report and Recommendation. Regarding the State agency physicians, 20 CFR § 404.1527(f)(2)(i) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The undersigned notes he has on numerous occasions cited the above Regulation to support an ALJ's favoring a State agency physician's opinion over that of a treating physician. The ALJ's stated reasons for rejecting the two State agency physicians' opinions that Plaintiff was limited to sedentary-level work are as follows:

> The undersigned accepts the State Agency Physicians' [sic] opinion [of May 26, 2004] to the extent that the claimant is not disabled and is able to perform work. However, based on evidence of record that was not available at the time Dr. Franyutti gave his opinion, the undersigned does not agree that the claimant's residual functional capacity is limited to sedentary work activity . . . .
>
> [and]
>
> The undersigned accepts the State Agency Physicians' [sic] opinion [of August 27, 2004] to the extent that the claimant is not disabled

and is able to perform work. Based on evidence of record that was not available at the time the Physical Residual Functional Capacity assessment was completed, the undersigned does not agree that the claimant's residual functional capacity is limited to sedentary work activity.

(R. 25, 26). The ALJ does not discuss, however, what evidence that was not available at the time

of the decisions formed the basis for his opinion and why. The FCE, which is the only evaluation

of Plaintiff's ability to perform work that indicated any exertional level above sedentary, was

performed more than a year before the two State agency physicians made their determinations.

Additionally, that FCE, the only evidence after the first ALJ decision that states that Plaintiff could

work at the sedentary to light exertional level, appears inconsistent with the Regulations. §404.1567

provides:

Physical exertion requirements. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

The FCE, however, indicates that Plaintiff had only a "marginal" ability to sit 1/3 to 2/3 of an 8-hour

workday, and could stand or walk only 0% to 33% of an 8-hour workday (R. 363). This to the

undersigned at least appears inconsistent with the ability to do "a good deal of walking or standing."

Plaintiff also argues the ALJ erred by failing to follow AR 00-1(4) when considering his

RFC. Defendant argues: "Although the ALJ did not fully comply with the provisions of Social

Security Acquiescence Ruling 00-1(4) by omitting the weight he gave to the prior ALJ's RFC

finding that Plaintiff was limited to sedentary work, this error is harmless since the vocational expert

identified sedentary jobs which allowed for a sit-stand option." AR 00-1(4) "applies [] to a finding

of a claimant's residual functional capacity or other finding required at a step in the sequential

evaluation process for determining disability . . . Which was made in a final decision by an ALJ or

the Appeals Council on a prior disability claim." The Ruling provides:

> When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. . . . .
>
> Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity . . . the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increased. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks as in Lively. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds thee years as in Albright. In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.

(Citing Albright v. Commissioner, 174 F.3d 473 (4th Cir. 1999), Lively v. Heckler, 820 F.2d 1391

(4th Cir. 1987). According to the two ALJ decisions at issue, Plaintiff's residual functional capacity

improved from sedentary on March 28, 2001, to light on March 29, 2001. Further, the ALJ in the

present claim did not consider the prior finding and give it appropriate weight. In fact, he did not

mention the prior RFC. Defendant admits the ALJ erred, but argues the error is harmless because

1) the vocational expert identified sedentary jobs which allowed for a sit-stand option, and 2) "it is

also well-settled that if a claimant can perform light work, the regulations also provide that the

claimant can also perform the less exertionally demanding sedentary work." (Defendant's brief at

11). The undersigned does not agree that the error was harmless in this case. Further, if Defendant's argument was correct, the Commissioner would simply need to find every claimant could work at the heavy exertional level, but have the VE name jobs that existed at every level to meet the requirements of the analysis.

More importantly under the facts of this case, however, the undersigned finds that the error contributes to a finding that substantial evidence does not support the ALJ's RFC determination.

### F. Treating Physician Opinion

Plaintiff next argues that the ALJ erred by improperly rejecting the treating physician's opinion. Defendant contends the ALJ properly evaluated the Medical Opinion of Dr. Milan. There is no dispute that Dr. Milan is Plaintiff's treating physician. The Fourth Circuit held: "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).    20 CFR § 404.1527 provides:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more

weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant

33

evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Even if Dr. Milan's opinion was not entitled to controlling weight, the ALJ would have had to then "apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion" and "give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." The undersigned finds the ALJ here did not do so. Again, there is no doubt that Dr. Milan was Plaintiff's treating physician. She treated him from at least March 2002, through the date of the ALJ's decision, October 2005. She saw him quite often, at times twice a week. The majority of his treatment was for his back problems, although some was for his high blood pressure and insomnia (due to pain). She referred Plaintiff to specialists and for testing. These factors all weigh highly in favor of according Dr. Milan's opinion great, if not controlling weight. Dr. Milan also presented a great deal of objective medical evidence, that is, Plaintiff's medical history; medical signs and laboratory findings; objective medical evidence of pain including straight leg raising tests and sensory tests.); evidence of his daily activities; specific descriptions of the pain; and the medical treatment taken to alleviate it.

The ALJ did not follow the requirements of the Regulation in his treatment of Dr. Milan's opinion. He also did not specifically state what weight he did give the opinion or give good reasons for that weight. For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's treatment of Dr. Milan's opinions.

## G. Credibility

Plaintiff lastly argues that the ALJ erred in concluding that Mr. Blake was not credible.

Defendant contends the ALJ properly concluded that Plaintiff was not fully credible. The Fourth

Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine

the credibility of the claimant, the ALJ's observations concerning these questions are to be given

great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger,

409 F.Supp. 776 (E.D.Va.1976)). The Fourth Circuit has developed a two-step process for

determination of whether a person is disabled by pain or other symptoms as announced in Craig v.

Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the

> pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R.
> § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig*, *supra* at 594.

Here the ALJ determined that Plaintiff met the first, threshold step. He was therefore

required to evaluate Plaintiff's credibility, taking into account "all the available evidence."

The undersigned notes that the ALJ made an AR 00-1(4) analysis of the prior ALJ's

credibility determination. This, however, was not necessary, since the Acquiescence Ruling

expressly states:

> In making a finding of a claimant's residual functional capacity or
> other finding required to be made at a step in the applicable sequential
> evaluation process for determining disability provided under the
> specific sections of the regulations described above, an ALJ or the
> Appeals Council may have made certain subsidiary findings, such as
> a finding concerning the credibility of a claimant's testimony or
> statements. A subsidiary finding does not constitute a finding that is
> required at a step in the sequential evaluation process for determining
> disability. . . .

Fn. 5.

The ALJ did discuss the factors contained in *Craig*, including the claimant's statements about

his pain, his medical history, medical signs, and laboratory findings, objective medical evidence of

pain, evidence of his daily activities, specific descriptions of the pain, and any medical treatment

taken to alleviate it. The "daily activities" upon which the ALJ partially relies are, however,

misleading. The ALJ states:

> However, the claimant, per his own testimony and reports to
> physicians'[sic], engages in significant daily activities, such as
> mowing his yard . . . and carrying buckets of water from a stream to
> his house . . . .The undersigned notes that these tasks seem likely
> much greater than the limited light work that he has limited the
> claimant to.

Plaintiff only reported carrying buckets of water for one 6-day period during the entire six years

36

covered by his two claims. He was carrying buckets of water from a stream to his home to flush toilets, etc. because the power had been off at his home. He complained of a great deal of exacerbation of his back pain after doing so. While this may not have been a wise chore for Plaintiff to perform, and may be evidence that he was not as impaired as he stated, the undersigned cannot agree that this should be considered a "daily activity." Further, the undersigned does not find persuasive the ALJ's statement: "Certainly the jobs identified by the vocational expert do not require strenuous activity such as mowing the lawn on a riding mower."

The ALJ mentioned Plaintiff's complaints that his medications made him groggy, drowsy, and affected his concentration. Dr. Milan also noted that Plaintiff was " maintained on strong pain medications" and opined that: "These medications have expected side effects of grogginess and sleepiness, which affect Mr. Blake's ability to focus on work tasks." Further, " Mr. Blake's lack of sleep also contributes to significant daytime drowsiness, which would in turn also cause him to lose focus on daily tasks." The ALJ did not discuss these side effects and did not limit him in any way (e.g., avoiding hazards) due to these side effects. The ALJ did mention the one occasion reported in the records in six years where Plaintiff's blood test was negative for Oxycodone, and another time when Plaintiff appeared for his appointment without his TENS unit. The ALJ, however, did not note the fact that Dr. Milan seemed unconcerned about both instances, and regarding the TENS unit, specifically stated that he came in without his TENS unit, but was not allowed to drive with it on.

The undersigned finds substantial evidence does not support the ALJ's credibility determination in this matter.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled at any time from March 29, 2001, through the date of his decision. If, on remand, it is determined that Plaintiff was disabled, the undersigned further recommends the Commissioner investigate the propriety of reopening the prior claim.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for SSI and DIB is not supported by substantial evidence, and I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 24] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 20] be **GRANTED** by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John P. Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___5___ day of November, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE